## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CAUSE OF ACTION INSTITUTE<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 18-cv-02373 (ABJ)

### DECLARATION OF VANESSA R. BRINKMANN

I, Vanessa R. Brinkmann, declare the following to be true and correct:

1. I am Senior Counsel in the Office of Information Policy (OIP), United States Department of Justice (DOJ or "the Department"). In this capacity, I am responsible for supervising the handling of Freedom of Information Act (FOIA) requests subject to litigation that are processed by the Initial Request Staff (IR Staff) of OIP. The IR Staff of OIP is responsible for processing FOIA requests seeking records from within OIP and from six senior leadership offices of the DOJ, specifically the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), Associate Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs (PAO). The IR Staff determines whether records responsive to FOIA requests exist and, if so, whether they can be released in accordance with the FOIA. In processing such requests, the IR Staff consults with personnel in the senior leadership offices and, when appropriate, with other personnel in the Executive Branch.

2. I make the statements herein on the basis of personal knowledge, as well as information provided to me by others within the Executive Branch of the Federal Government

with knowledge of the types of records at issue in this case, and on information acquired by me in the course of performing my official duties.

## I.     Plaintiff's FOIA Request OIP's Responses Thereto

3.     Plaintiff submitted a FOIA request to OIP that was dated December 24, 2013 and received at OIP on December 30, 2013.  This request sought (1) "[a]ll documents, including but not limited to email communications, referring or relating to Executive Order 13457, 'Protecting American Taxpayers from Government Spending on Wasteful Earmarks,'" (2) "[a]ll documents, including but not limited to email communications between and among any political appointee, White House liaison, congressional liaison, and/or any employee of the White House, referring or relating to any request to commit, obligate, or expend funds," and (3) "[a]ll documents evidencing the agency's decision to commit, obligate, or expend funds based upon a request from Congress or the White House."  A copy of Plaintiff's FOIA request to OIP is attached hereto as Exhibit A.

4.     By letter dated February 3, 2014, OIP acknowledged Plaintiff's FOIA request on behalf of OAG, ODAG, and OLA and confirmed the following tracking numbers: AG/14-01094 (F), DAG/14-01095 (F), OLA/14-01096 (F).  A copy of OIP's acknowledgement letter to Plaintiff is attached hereto as Exhibit B.

5.     By letters dated September 14, 2017, September 29, 2017, and January 30, 2018, OIP provided interim and final responses to Plaintiff's FOIA request, which provided the following information to Plaintiff.  In total, OIP located 1,021 pages containing records responsive to Plaintiff's request.  OIP determined that seventy-nine of these pages were appropriate for release, some with excisions made pursuant to Exemptions 5 and 6 of the FOIA, 5 U.S.C. § 552(b)(5)

and (b)(6). [1]  OIP withheld eighty-six pages in full pursuant to Exemption 5 of the FOIA, 5

U.S.C. § 552(b)(5).  Finally, OIP referred the remaining 856 pages to other DOJ components for

processing and direct response to Plaintiff.  Additionally, these response letters confirmed that

pursuant to an April 2016 communication from Plaintiff, the scope of this request was "all

communications between a Department political appointee and Members of Congress, their staff,

or employees of the White House relating to grants of the Office of Justice Programs, Office on

Violence Against Women, and Community Oriented Policing Services" and "records relating to

Executive Order 13457."  Copies of OIP's response letters to Plaintiff are attached hereto as

Exhibits C, D, and E.  I describe OIP's production in greater detail below.

6.   By letter dated February 1, 2018, Plaintiff submitted an administrative appeal

regarding OIP's January 30, 2018 final response letter.  A copy of Plaintiff's administrative

appeal to OIP is attached hereto as Exhibit F.

7.   By letter dated March 15, 2018, OIP's Administrative Appeals Staff[2] responded to

Plaintiff's February 1, 2018, appeal, affirming the IR Staff's action on the request on behalf of

OLA and confirming the IR Staff's determination that each question for the record ("QFR")

constituted an individual record because each QFR concerned a different subject.  A copy of

OIP's administrative appeal response to Plaintiff is attached hereto as Exhibit G.

8.   On October 15, 2018, Plaintiff filed suit.  *See* Complaint, ECF No. 1.

---

[1] On April 5, 2019, via counsel, OIP provided Plaintiff with revised copies of five of these pages.
[2] OIP's Administrative Appeals Staff is a separate and distinct unit within OIP which adjudicates administrative appeals of initial request responses made by DOJ components.

**II.     Adequacy of Search and Applicability of FOIA Exemptions**

9.   Plaintiff has neither raised a challenge to the adequacy of OIP's search under FOIA for records responsive to Plaintiff's request, nor does Plaintiff challenge OIP's application of any FOIA Exemptions.  *See id.*  Accordingly, this declaration does not address those issues.

**III.     OIP Identified and Processed Responsive Records in their Entirety**

10. Plaintiff challenges redactions labelled "Non-Responsive Record" within the material produced to Plaintiff by OIP.  *See id.* at ¶ 22-54.

11. As part of OIP's search process, an initial keyword search was conducted in order to locate a volume of potentially responsive records.  OIP then undertook the process of reviewing the universe of material located by this search in order to identify records responsive to Plaintiff's request.  From this universe of material, OIP identified discrete records responsive to Plaintiff's request.  OIP then processed these responsive records in their entirety, applying FOIA exemptions as appropriate and releasing all non-exempt material.

12. OIP has no obligation to process records which are not responsive to Plaintiff's request.  Accordingly, OIP declined to do so.  Where OIP determined that a record was not responsive, and where such record appeared on the same PDF page as a record identified as responsive, OIP accordingly marked the non-responsive record as "Non-Responsive Record." Further, where certain pages within a given document contained no responsive records, OIP removed these pages in their entirety, in this case totaling thirty-seven pages.   A copy of the material at issue in this case, containing these markings, is attached hereto as Exhibit H.

A.     OIP's Guidance on Defining a "Record" Under the FOIA

13. After the decision in *American Immigration Lawyers Association v. EOIR* ("*AILA*"), 830 F.3d 667 (D.C. Cir. 2016), OIP issued guidance consistent with this ruling in order to assist federal agencies in  determining whether it is appropriate to divide a document into discrete

"records." *Defining a "Record" Under the FOIA*, Dep't of Justice: OIP Guidance (updated

Feb. 15, 2017), https://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia. A

copy of OIP's guidance is attached hereto as Exhibit I.

14. All determinations made by OIP when processing Plaintiff's request were fully

consistent with this guidance, with the D.C. Circuit's decision in *AILA*, and with the FOIA.

B.    OIP's Bases for Determining Whether It is Appropriate to Divide
      Documents into Discrete Records

15. OIP's first step in processing records pursuant to any given FOIA request is to

identify those records that are responsive to the request.  A critical part of this analysis involves

making a determination as to where one record ends and the next begins.  In order to make this

determination, OIP conducts a careful review of the material it locates in order to assess whether

the material contains discrete groupings of information, distinguished by reasonable breaks from

the information preceding it and following it.  These breaks in information are defined both by

the material's content *and* by the subject of the FOIA request.  *See id.* (providing as an example a

document containing complaints against a list of administrative law judges, where (1) for

purposes of a FOIA request seeking "complaints against all administrative law judges," the entire

document would be defined as the responsive "record," and whereas (2) for purposes of a FOIA

request seeking "complaints against Judge Smith," only the particular section discussing

complaints concerning Judge Smith would be defined as the responsive "record").

16. OIP's analysis is further informed by the physical characteristics of the document,

such as headers, spacing, bullet points, or numbering, which signify a break in information and,

consequently, a distinct record.  For example, a paragraph or a bullet point could constitute a

distinct record, if the subject of the request is sufficiently specific to pertain to only that

paragraph or bullet point, or the subject of the paragraph is sufficiently distinct from the

surrounding paragraphs.  This analysis also takes into account the fact that the individual who

created a given document may have had a particular purpose for compiling certain distinct and discrete pieces of information together.

17. However, OIP also recognizes that, although that individual may have had a particular purpose for compiling disparate pieces of information together at the time a document was created, that document is no longer serving or furthering that purpose in the context of a FOIA review, and the compilation of that information could appear entirely arbitrary in the context of a FOIA request seeking only records on a discrete topic.  In some contexts, the compilation of information is relevant and makes the entire document a responsive record to the request, but in other contexts, the compilation is wholly irrelevant to the FOIA request at hand. A rigid, one-size-fits-all analysis of the boundaries of a record, which fails to account for this distinction, would regularly result in federal agencies processing and producing superfluous, discrete packages of information that are wholly nonresponsive to a given FOIA request.  This would do a disservice to both FOIA requesters and the FOIA process as a whole.

18. Finally, OIP notes that FOIA professionals review material every day in order to identify records responsive to a given FOIA request.  The information they review may exist in two separate physical documents, or it may exist in two separate portions of one physical document.  For these FOIA professionals, their analysis is focused on the *content* of the document, in relation to the FOIA request at hand, rather than the physical form of the material. These professionals view material in the context of what has been sought by the FOIA requester and they are capable of identifying whether related information in separate documents or information that physically precedes or follows within the same document is itself responsive when viewed in context.

19. In sum, OIP engages in a holistic, content-based analysis, which takes into account *both* the substance of a given document and its relationship to what has been sought by the

requester.  Furthermore, OIP thoroughly reviews each set of material in conjunction with each

FOIA request to ensure that OIP is identifying the records responsive to that request.  Once OIP

determines which records are responsive to a request, OIP then processes each responsive record

in its entirety, applies FOIA exemptions as appropriate, and releases all non-exempt responsive

records to the requester.

C.    OIP's Bases for Determining that it was Appropriate in this Case
to Divide Documents into Discrete Records

20. In this case, Plaintiff seeks records on a discrete topic.  As described in more detail in

Part I, *supra*, plaintiff seeks various records related to Executive Order 13457 or of

communications or decisions related to committing, obligating, or expending funds.  As part of

OIP's search for responsive records, OIP located documents consisting of Questions for the

Record (these documents will hereinafter be referred to as "QFRs").  QFRs consist of written

questions from members of Congress which, when located in DOJ files, are typically directed to

an individual or component within DOJ.  QFRs are normally first received by OLA, who then

divides the questions by subject-matter and assigns individual questions to various individuals or

components to prepare responses based on expertise.  Some of the QFRs located by OIP

contained written responses, and others did not.

21. QFRs by their nature are multi-subject documents.  They may be sent in multiple

files, divided by Senator or Representative, or they may be compiled into one large file.  In total,

QFRs often consist of hundreds of pages of questions, and questions can come from dozens of

Senators or Representatives (typically all members assigned to a particular Congressional

committee), and each individual member of Congress may pose a handful to dozens of questions.

These questions from one member often encompass a wide variety of disparate topics. The QFRs located by OIP in this case were no different.[3]

22. In this case, when OIP reviewed the QFRs included in the universe of material located by its searches,[4] OIP understood the Congressional creators' predominant purpose in compiling these disparate questions into one document to be efficiency. OIP observed that QFRs provide an opportunity for multiple members of Congress to each ask multiple questions all within a single, compiled document. OIP was also aware of the Department's own internal practice of dividing up QFRs into their constituent parts and assigning them to various individuals or components for the purpose of drafting responses. Because the original purpose for compiling QFRs is efficiency, OIP has determined that each question from an individual member of Congress in QFRs is not automatically part of a larger responsive "record" in the FOIA context. This is especially true here, where the decision to compile these disparate QFRs into one "document" is wholly irrelevant in the context of Plaintiff's FOIA request, which seeks specific material. The discrete questions or answers identified as nonresponsive within the QFRs are in fact records wholly nonresponsive to Plaintiff's request. More specifically, the non-responsive questions and answers are not at all related to the topic of Plaintiff's FOIA request.

23. OIP's determination that in the context of this request each question constitutes a distinct record is further informed by the physical attributes of the QFRs. First, these QFRs are divided by individual members of Congress, with each member's questions beginning on a new page, indicating that QFRs actually comprise a series of distinct questions by distinct people.

---

[3] To provide just a few examples, within the QFRs located by OIP, there were questions regarding Guantanamo Bay, NSA warrantless surveillance, and faith-based discrimination under Title VII.

[4] OIP located QFRs arising from Attorney General Eric Holder's appearances before the House and Senate Judiciary Committees and QFRs arising from the Director of the DOJ Office on Violence Against Women's appearance at a House Judiciary Committee oversight hearing.

Second, on a given page within QFRs, there are clear physical space breaks between each question or sub-question, and each question or sub-question is numbered,[5] further signifying that each numbered question or sub-question is a discrete and separate package of information from those questions preceding or following it.  In each instance where OIP identified a question or sub-question that fell within the scope of Plaintiff's request, OIP considered the corresponding answer to be a part of the responsive record, consisting of both the question or sub-question and the answer.  The same was true where OIP identified an answer that fell within the scope of Plaintiff's request, and OIP then considered the corresponding question or sub-question to be a part of the responsive record.

24. Because OIP recognizes that any given member of Congress may choose to ask a line of questions on a given topic, spanning across more than one question number, OIP conducted a thorough, content-based review of each question in the context of the question(s) preceding or following it.  This ensured that OIP captured all responsive records within the QFRs, including those that could be identified as responsive only as a direct result of the context of the other questions surrounding it.  In its response to Plaintiff's FOIA request, OIP only marked records, these discrete groupings of questions and answers, as nonresponsive where there was a clear and distinct break in content and where the content on one side of the break was responsive to Plaintiff's request and the content on the other side was wholly nonresponsive.[6]  These clear and distinct breaks reinforced OIP's determination that each question was analogous to a Congressional letter making an inquiry and each formed distinct "records," only some of which

---

[5] "Numbered" should be understood to also apply where a letter is used instead of a number.

[6] By way of example, OIP released a question and answer package regarding funding requested by DOJ for the analysis of DNA samples in rape kits.  Immediately following that record was a distinct question and answer grouping regarding sentencing guidelines and mandatory minimum sentences.  The former falls squarely within the narrowed scope of Plaintiff's request, and the latter falls squarely outside of this scope.

were responsive to plaintiff's request.    Because each answer was a direct response to the immediately preceding question, OIP determined that the question and answer together formed a discrete unit constituting a record.

25. With regard to OIP's process generally, and specifically with regard to OIP's processing of QFRs, the ability to divide documents into distinct records allows agency staff to process more efficiently, especially to the extent that responsive records require consultation with other equity holders.  Even accounting for the time it takes to identify records within a given document and to apply non-responsive redactions, this process is still far more efficient because the alternative—processing non-responsive records—would implicate multiple layers of unnecessary review.

I declare under penalty of perjury that the foregoing is true and correct.


Vanessa R. Brinkmann

Executed this 5th day of April 2018.

# Exhibit A



AG|2014-01094
DAG|2014-01095
OLA|2014-01096
FOIA
SBT
VAV Reviewer

December 24, 2013

**VIA EMAIL AND CERTIFIED MAIL**

Ms. Carmen L. Mallon
Chief of Staff
Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, DC 20530-0001
Email: DOJ.OIP.FOIA@usdoj.gov

RECEIVED

DEC 3 0 2013

Office of Information Policy

**RE: Freedom of Information Act Request**

Dear Ms. Mallon:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Cause of Action hereby requests access to the following records of the U.S. Department of Justice (DOJ) from January 21, 2009 to the present:

1. All documents, including but not limited to email communications, referring or relating to Executive Order 13457, "Protecting American Taxpayers from Government Spending on Wasteful Earmarks."[1]
2. All documents, including but not limited to email communications between and among any political appointee, White House liaison, congressional liaison, and/or any employee of the White House,[2] referring or relating to any request to commit, obligate, or expend funds.
3. All documents evidencing the agency's decision to commit, obligate, or expend funds based upon a request from Congress or the White House.

**Request for public interest fee waiver**

Cause of Action requests a waiver of any and all applicable fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), which provides that requested records shall be furnished without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." As discussed below, Cause of Action satisfies the statutory standard for a fee waiver.

---

[1] Exec. Order No. 13,457, 73 Fed. Reg. 6,417 (Feb. 1, 2008).
[2] "White House" should be construed to include the President, the Vice President, their advisers and any employee or officer of the Executive Office of the President.

1919 Pennsylvania Ave, NW
Suite 650
Washington, DC 20006

www.CauseOfAction.org                                                                                      Ph: 202.499.4232

Ms. Carmen Mallon
December 24, 2013
Page 2

A. *Disclosure of the requested records is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government.*

As an initial matter, we note that "obtaining information to act as a 'watchdog' of the government is a well-recognized public interest in the FOIA."[3]  In this instance, Cause of Action seeks disclosure of the requested records as a "watchdog" of government spending.  As discussed below, the request meets the four-factor test used by the DOJ to determine whether disclosure of the requested information is in the public interest.[4]

First, the requested records concern identifiable "operations or activities of the government,"[5] namely, the DOJ's spending practices as well as how the Executive Branch and Congress shapes federal spending decisions committed to an agency's discretion.  Second, the requested information is "likely to contribute" to understanding the DOJ's operations because the public is largely unaware of the manner in which funds are awarded and their susceptibility to politicization.[6]

Third, disclosure will contribute to "public understanding," as opposed to the understanding of the requester or a narrow segment of interested persons.[7]  We note in this context that Cause of Action has both the intent and ability to make the results of this request available to the public in various media.  Our staff has a wealth of experience and expertise in government oversight, investigative reporting, and federal public interest litigation.  These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work and share the resulting analysis with the public, whether through Cause of Action's regularly published online newsletter, memoranda, reports, or press releases.  For example, Cause of Action recently published two reports on its website that reached a broad segment of the public via Twitter and email.[8]  Fourth, disclosure is likely to "significantly" contribute to the public understanding, as the requested records are not readily available from any public sources.[9]

---

[3] Baltimore Sun v. U.S. Marshals Serv., 131 F. Supp. 2d 725, 729 (D. Md. 2001); *see also* Ctr. to Prevent Handgun Violence v. U.S. Dep't of the Treasury, 981 F. Supp. 20, 24 (D.D.C. 1997) ("This self-appointed watchdog role is recognized in our system.").

[4] *See* 28 C.F.R. § 16.11(k) (DOJ FOIA requirements for waiver or reduction of fees under the "public interest" test).

[5] *Id.* § 16.11(k)(2)(i).

[6] *Id.* § 16.11(k)(2)(ii).

[7] *Id.* § 16.11(k)(2)(iii).

[8] *See* CAUSE OF ACTION, GREENTECH AUTOMOTIVE: A VENTURE CAPITALIZED BY CRONYISM (Sept. 23, 2013), http://causeofaction.org/2013/09/23/greentech-automotive-a-venture-capitalized-by-cronyism-2/; *see also* CAUSE OF ACTION, POLITICAL PROFITEERING: HOW FOREST CITY ENTERPRISES MAKES PRIVATE PROFITS AT THE EXPENSE OF AMERICAN TAXPAYERS PART I (Aug. 2, 2013), http://causeofaction.org/2013/08/02/political-profiteering-how-forest-city-enterprises-makes-private-profits-at-the-expense-of-americas-taxpayers/.

[9] 28 C.F.R. § 16.11(k)(2)(iv).

Ms. Carmen Mallon
December 24, 2013
Page 3

     *B. Disclosure of the requested information is not primarily in the commercial interest of Cause of Action.*

     Cause of Action does not seek the requested information to benefit commercially.[10] Cause of Action is a nonprofit organization as defined under section 501(c)(3) of the Internal Revenue Code. Our organization is committed to advancing public awareness of the activities of government agencies and ensuring the lawful and appropriate use of government funds by those agencies. Disclosure of the requested information would not significantly further any business, trade, or profit interest. Rather, Cause of Action intends to use the information to educate the public about DOJ's spending and its implementation of Executive Order 13457.[11] For the foregoing reasons, this request is not primarily in Cause of Action's commercial interest and Cause of Action is entitled to a waiver of any fees.

## Request for news media status

     For fee purposes, Cause of Action also qualifies as a "representative of the news media" under 5 U.S.C. § 552(a)(4)(A)(ii)(II). Cause of Action is organized and operated, *inter alia*, to research, generate, publish, and broadcast news, *i.e.*, information that is about current events or that would be of current interest to the public. Cause of Action gleans the information that it regularly publishes from a wide variety of sources and methods, including whistleblowers/insiders, government agencies, universities, scholarly works, and FOIA requests. Cause of Action routinely and systematically disseminates information acquired from such sources to the public through various media. For example, Cause of Action distributes articles, blog posts, published reports, and newsletters about current events of interest to the general public through its website, which has been viewed just under 120,000 times in the past year alone.[12] Cause of Action also disseminates news to the public via social media platforms Twitter and Facebook, and provides news updates to subscribers via e-mail. As a result of these activities, federal agencies have repeatedly recognized Cause of Action's news media status in connection with its FOIA requests.[13]

## Record production and contact information

     In an effort to facilitate record production, please provide the responsive records in electronic format (*e.g.*, email, pdf). If a certain set of responsive records can be produced more

---

[10] *Id.* § 16.11(k)(3)(i) (requiring that the request not be primarily in the commercial interest of the requestor to qualify for a fee waiver).

[11] *See* Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 38 (D.C. Cir. 1998).

[12] *See* www.causeofaction.org; Google Analytics for www.causeofaction.org (Jan. 1, 2013 – Dec. 20, 2013) (on file with author).

[13] *See, e.g.*, FOIA Request 14F-036, Health Res. and Serv. Admin. (Dec. 6, 2013); FOIA Request CFPB-2014-010-F, Consumer Fin. Prot. Bureau (Oct. 7, 2013); FOIA Request 2013-01234-F, U.S. Dep't of Energy (July 1, 2013); FOIA Request 2013-145F, Consumer Fin. Prot. Bureau (May 29, 2013); FOIA Request 2013-073, U.S. Dep't of Homeland Sec. (Apr. 5, 2013); FOIA Request 2012-RMA-02563F, U.S. Dep't of Agric. (May 3, 2012); FOIA Request 2012-00270, U.S. Dep't of the Interior (Feb. 17, 2012); U.S. Dep't of Commerce (Mar. 1, 2012); FOIA Request No. 12-00455-F., U.S. Dep't of Educ. (Jan. 20, 2012).

Ms. Carmen Mallon
December 24, 2013
Page 4

readily, we request that those records be produced first and that the remaining records be produced on a rolling basis as circumstances permit.

     If you have any questions about this request, please contact me by email at Allan.Blutstein@causeofaction.org or by telephone at (202) 499-4232. Thank you for your attention to this matter.

ALLAN BLUTSTEIN
SENIOR COUNSEL

# Exhibit B



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

February 3, 2014

Allan Blutstein, Esq.
Cause of Action
Suite 650                                             Re:     AG/14-01094 (F)
1919 Pennsylvania Avenue, NW                              DAG/14-01095 (F)
Washington, DC  20006                                    OLA/14-01096 (F)
allan.blutstein@causeofaction.org                        VAV:SBT

Dear Mr. Blutstein:

         This is to acknowledge receipt of your Freedom of Information Act (FOIA) request
dated December 24, 2013, and received in this Office on December 30, 2013, in which you
requested 1) records relating to Executive Order 13457, "Protecting American Taxpayers from
Government Spending on Wasteful Earmarks," 2) communications between political
appointees, congressional liaisons and/or the White House regarding requests to commit,
obligate, or expend funds, and 3) documents showing the decision of the Department of Justice
to commit, obligate, or expend funds based upon a request from the White House.  The date
range applicable to your request is from January 21, 2009.  This response is made on behalf of
the Offices of the Attorney General, Deputy Attorney General, and Legislative Affairs.

         The records you seek require a search in another Office, and so your request falls
within "unusual circumstances."  See 5 U.S.C. 552 § (a)(6)(B)(i)-(iii).  Because of these
unusual circumstances, we need to extend the time limit to respond to your request beyond the
ten additional days provided by the statute.  The time needed to complete our processing of
your request will necessarily depend on the complexity of our records search and on the
volume and complexity of any records located.  For your information, this Office assigns
incoming requests to one of three tracks:  simple, complex, or expedited.  Each request is then
handled on a first-in, first-out basis in relation to other requests in the same track.  Simple
requests usually receive a response in about a month, whereas complex requests necessarily
take longer.  At this time, your request has been assigned to the complex track.  In an effort to
speed up our records search, you may wish to narrow the scope of your request to limit the
number of potentially responsive records or agree to an alternative time frame for processing,
should records be located; or you may wish to await the completion of our records search to
discuss either of these options.  As you may be aware, I have been in contact via e-mail with
Kevin Schmidt of your organization regarding how to interpret the scope of items 2 and 3 of
this request and I am currently awaiting a response from him.

         We have not yet made a decision on your request for a fee waiver.  We will do so after
we determine whether fees will be assessed for this request.

-2-


I regret the necessity of this delay, but I assure you that your request will be processed as soon as possible.  If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact me by telephone at the above number or you may write to me at the Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001.  Lastly, you may contact our FOIA Public Liaison at the telephone number listed above to discuss any aspect of your request.

Sincerely,

Sara B. Tennant
Government Information Specialist

# Exhibit C



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

September 14, 2017

Mr. James Valvo
Cause of Action
1875 Eye Street, NW, Suite 800          Re:      AG/14-01094 (F)
Washington, DC  20006                            DAG/14-01095 (F)
james.valvo@causeofaction.org                    OLA/14-01096 (F)
                                                 CLM:LMT

Dear Mr. Valvo:

This is an interim response to the Freedom of Information Act (FOIA) request originally submitted by Allan Blutstein on December 24, 2013, and received in this Office on December 30, 2013.  The request sought records relating to (1) Executive Order 13457, "Protecting American Taxpayers from Government Spending on Wasteful Earmarks"; (2) communications between political appointees, congressional liaisons, and/or the White House regarding requests to commit, obligate, or expend funds; and (3) documents showing the decision of the Department of Justice to commit, obligate, or expend funds based upon a request from Congress or the White House, dating since January 21, 2009.  This response is made on behalf of the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), and Legislative Affairs (OLA).

Pursuant to your April 2016 communication with this Office, you confirmed that you were seeking all communications between a Department political appointee and Members of Congress, their staff, or employees of the White House relating to grants of the Office of Justice Programs, Office on Violence Against Women, and Community Oriented Policing Services. Additionally, you confirmed your continued interest for records relating to Executive Order 13457.

Please be advised that records searches have been conducted in OAG, ODAG, and OLA, as well as of the electronic database of the Departmental Executive Secretariat, which is the official records repository for OAG, ODAG, and OLA, and records responsive to your request have been located.  At this time, our review of the records that are of primary interest to ODAG is complete, and we located five pages that contain records that are responsive to your request.  I have determined these pages should be withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process privilege.  For your information, the withheld material consists of draft responses to congressional Questions for the Record.

Inasmuch as this completes our review of the material of primary interest to ODAG, I am closing the administrative tracking number (DAG/14-01095 (F)) associated with that Office.  We

-2-

will respond to you again once our review and disclosure determinations have been made on the material of primary interest to OAG and OLA.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. *See* 5 U.S.C. § 552(c) (2015) (amended 2016). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison, Laurie Day, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001; telephone at 202-514-3642; or facsimile at 202-514-1009.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response on behalf of the Office of the Deputy Attorney General, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal at https://foiaonline.regulations.gov/foia/ action/public/home. Your appeal must be postmarked or electronically submitted within ninety days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Carmen L. Mallon
Chief of Staff

# Exhibit D



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

September 29, 2017

Mr. James Valvo
Cause of Action
1875 Eye Street, NW, Suite 800                    Re:    AG/14-01094 (F)
Washington, DC  20006                                    OLA/14-01096 (F)
james.valvo@causeofaction.org                             CLM:LMT

Dear Mr. Valvo:

This is an interim response to the Freedom of Information Act (FOIA) request originally submitted by Allan Blutstein on December 24, 2013, and received in this Office on December 30, 2013.  The request sought records relating to (1) Executive Order 13457, "Protecting American Taxpayers from Government Spending on Wasteful Earmarks"; (2) communications between political appointees, congressional liaisons, and/or the White House regarding requests to commit, obligate, or expend funds; and (3) documents showing the decision of the Department of Justice to commit, obligate, or expend funds based upon a request from Congress or the White House, dating since January 21, 2009.  This response is made on behalf of the Offices of the Attorney General (OAG) and Legislative Affairs (OLA).

Pursuant to your April 2016 communication with this Office, you confirmed that you were seeking all communications between a Department political appointee and Members of Congress, their staff, or employees of the White House relating to grants of the Office of Justice Programs, Office on Violence Against Women, and Community Oriented Policing Services. Additionally, you confirmed your continued interest for records relating to Executive Order 13457.

By letter dated September 14, 2017, we provided our response on behalf of the Office of the Deputy Attorney General (ODAG), and informed you that we would respond again once our review and disclosure determinations were made on the OAG and OLA material.  Please be advised that our review on behalf of OAG is complete, and we located 873 pages that contain records that are responsive to your request.  I have determined that forty-seven pages are appropriate for release without excisions, and copies are enclosed.

Furthermore, I have determined that ten pages should be withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process privilege.  For your information, the withheld material consists of various drafts, including responses to congressional Questions for the Record and a grant program.

-2-

Lastly, because 816 pages originated with or are of primary interest to the Office of Justice Programs (OJP), the Justice Management Division (JMD), or the Community Oriented Policing Services (COPS), we referred that material to OJP, JMD, or COPS for processing and direct response to you.  Specifically, we referred 686 pages to OJP, 110 pages to JMD, and 20 pages to COPS.  Contact information for these components can be found at www.foia.gov.

Inasmuch as this completes our review of the material of primary interest to OAG, I am closing the administrative tracking number (AG/14-01094 (F)) associated with that Office.  We will respond to you again once our review and disclosure determinations have been made on the material of primary interest to OLA.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  *See* 5 U.S.C. § 552(c) (2015) (amended 2016).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison, Laurie Day, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001; telephone at 202-514-3642; or facsimile at 202-514-1009.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response on behalf of the Office of the Attorney General, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal at https://foiaonline.regulations.gov/foia/ action/public/home.  Your appeal must be postmarked or electronically submitted within ninety days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Carmen L. Mallon
Chief of Staff

# Exhibit E



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

January 30, 2018

Mr. James Valvo
Cause of Action
1875 Eye Street, NW, Suite 800
Washington, DC  20006                          Re:    OLA/14-01096 (F)
James.valvo@causeofaction.org                         CLM:LAD

Dear Mr. Valvo:

This is the final response to the Freedom of Information Act (FOIA) request originally submitted by Allan Blutstein on December 24, 2013, and received in this Office on December 30, 2013.  The request sought records relating to (1) Executive Order 13457, "Protecting American Taxpayers from Government Spending on Wasteful Earmarks;" (2) communications between political appointees, congressional liaisons and/or the White House regarding requests to commit, obligate, or expend funds; and (3) documents showing the decision of the Department of Justice to commit, obligate, or expend funds based upon a request from the White House, dating since January 21, 2009.  This response is made on behalf of the Office of Legislative Affairs (OLA).

 Pursuant to your April 2016 communication with this Office, you confirmed that you were seeking all communications between a Department political appointee and Members of Congress, their staff, or employees of the White House relating to grants of the Office of Justice Programs, Office on Violence Against Women, and Community Oriented Policing Services.  Additionally, you confirmed your continued interest for records relating to Executive Order 13457.

By letter dated September 29, 2017, we provided our response on behalf of the Office of the Attorney General (OAG), and informed you that we would respond again once our review and disclosure determinations were made on the OLA material.  Please be advised that our review on behalf of OLA is complete, and we located 143 pages that contain records that are responsive to your request.  I have determined that thirty-two pages are appropriate for release without excisions, and one page is appropriate for release with excisions made pursuant to Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6).  Copies are enclosed.  Please be advised that these pages also contained non-responsive records, which we have marked accordingly.

Furthermore, I have determined that seventy-one pages should be withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process privilege.  For your information, the withheld material consists of various drafts, including responses to congressional Questions for the Record and talking points.

-2-

Lastly, because thirty-four pages originated with or contain information of primary interest to the Justice Management Division (JMD), and five pages originated with or contain information of primary interest to the Office of Justice Programs (OJP), we have referred that material to JMD and OJP for processing and direct response to you.  Contact information for those components can be located at the following link: https://www.justice.gov/oip/find-foia-contact-doj/list.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  *See* 5 U.S.C. § 552(c) (2015) (amended 2016).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison, Doug Hibbard, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001; telephone at 202-514-3642; or facsimile at 202-514-1009.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal at https://foiaonline.regulations.gov/foia/action/public/home.  Your appeal must be postmarked or electronically submitted within ninety days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Carmen L. Mallon
Chief of Staff

# Exhibit F



# CAUSE of ACTION
## ═══ INSTITUTE ═══

Pursuing Freedom & Opportunity through Justice & Accountability™

February 1, 2018

**VIA CERTIFIED MAIL**

Melanie Pustay
Director
Office of Information Policy
United States Department of Justice
1425 New York Avenue, NW, Suite 11050
Washington, DC 20530-001

### Re:    Freedom of Information Act Appeal, OLA/14-1096



Dear Ms. Pustay:

This is a timely administrative appeal of an adverse Freedom of Information Act
("FOIA") determination by the Department of Justice ("DOJ") Office of Information Policy
("OIP") on FOIA request OLA/14-1096.  The final determination was made on behalf of the
Office of Legislative Affairs ("OLA").  Cause of Action Institute ("CoA Institute") appeals the
agency's improper definition of a "record" and its use of "non-responsive" as a redaction tool to
withhold information within responsive records.

### Background

On December 24, 2013, CoA Institute sent a FOIA request to OIP seeking "all
documents" related to Executive Order 13,457 and "all documents" reflecting communications
related to the agency's decisions to obligate or expend funds.[1]  On February 3, 2014, OIP
acknowledged receipt of the request and assigned it multiple tracking numbers, including
OLA/14-1096.[2]  Over the past few years, OIP has made several productions to various parts of
the request from various DOJ components.

As relevant to this appeal, on January 30, 2018, OIP sent a final determination letter on
the portion of the request it had designated as OLA/14-1096.[3]  The letter summarized that in
April 2016, CoA Institute and OIP had agreed that the scope of the request covered
"communications between a Department political appointee and Members of Congress, their
staff, or employees of the White House relating to grants of the Office of Justice Programs,
Office on Violence Against Women, and Community Oriented Policing Services" and "records
relating to Executive Order 13457."[4]  The letter stated that OIP and OLA had "located 143 pages

---

[1] Letter from Allan Blutstein, CoA Inst., to Office of Info. Pol'y., Dep't of Justice (Dec. 24, 2013) (Ex. 1).

[2] Letter from Sara B. Tennant, Gov't Info. Specialist, Dep't of Justice, to Allan Blutstein, CoA Inst. (Feb. 3, 2014)
(Ex. 2).

[3] Letter from Carmen L. Mallon, Chief of Staff, Office of Info. Pol'y., Dep't of Justice, to James Valvo, Cause of
Action Inst. (Jan. 30, 2018) (Ex. 3).

[4] *Id.* at 1.



A 501(C)(3) NONPROFIT CORPORATION

Ms. Pustay
February 1, 2018
Page 2

that contain records that are responsive to [the] request."[5]  OIP claimed that it was releasing
thirty-two of those pages "without excisions" and one page with minor redactions pursuant to
Exemption 6.  But of those thirty-two pages, eleven bore redactions labeled "Non-Responsive
Record" and OIP excised a significant amount of information.[6]  The agency also withheld
seventy-one pages in full pursuant to Exemption 5 and referred thirty-nine pages to other
components within DOJ for later direct release to CoA Institute.

Although OIP referred to the volume of the release in terms of the number of page and
not records, an examination of the materials shows that OIP released four records:

1. An email, dated May 16, 2011, from Rita C. Aguilar to Faith Burton, *et al.* discussing
   Senate Appropriations questions for the record ("QFRs").[7]  OIP did not withhold any
   information within this record. And, as such, there is no adverse determination on
   this record and it is not implicated in this appeal.

2. A letter, dated January 4, 2011, from then-Assistant Attorney General Ronald Weich
   to then-Chairman of the U.S. House Committee on the Judiciary John Conyers.[8]  The
   letter attached a single document containing responses to QFRs arising from an
   appearance of then-Attorney General Eric Holder before the committee on May 13,
   2010.  The full length and content of the attachment is unknown because OIP
   withheld numerous pages without explanation, even though that document was
   consecutively paginated and the QFRs and responses were consecutively numbered.
   OIP also withheld significant information within this document by applying
   redactions labeled "Non-Responsive Record."

3. A letter, dated September 14, 2010, from then-Assistant Attorney General Ronald
   Weich to then-Chairman of the U.S. Senate Committee on the Judiciary Patrick
   Leahy.[9]  Similar to the previous record, this letter attached a single document that
   contained responses to QFRs arising from an appearance of then-Director of the
   Office of Violence Against Women Susan Carbon before the committee on May 5,
   2010.  The attachment appears to be six pages in length and none of the consecutively
   paginated pages have been withheld, but OIP withheld information within the
   document by applying redactions labeled "Non-Responsive Record."

4. A letter, dated April 2010, from then-Chairman of the U.S. Senate Committee on the
   Judiciary Patrick Leahy to then-Attorney General Eric Holder.[10]  The letter attached
   QFRs submitted by committee members.  These attachments include a four-page set
   of QFRs from Senator Tom Coburn, which is consecutively paginated, and a two-

---

[5] *Id.*

[6] *See, e.g., id.* at 11.

[7] *Id.* at 3–7.

[8] *Id.* at 8–21.

[9] *Id.* at 22–28.

[10] *Id.* at 29–35.

Ms. Pustay
February 1, 2018
Page 3

      page set of QFRs from Senator Russell Feingold, which does not contain page
numbers. It does not appear that DOJ-OIP withheld any pages from the attachments
but it did withhold information by applying redactions labeled "Non-Responsive
Record."

## <u>Discussion</u>

      Instead of releasing Records 2, 3, and 4 in their entirety, subject to statutory exemptions,
OIP apparently segmented the records into what it claims are various distinct records and
withheld many of them by asserting they are a "Non-Responsive Record" to the request. This
action continues a DOJ pattern of relying on a guidance document to improperly segment one
record into multiple records in order to withhold information within a responsive record.[11]

      In *American Immigration Lawyers Association v. Executive Office for Immigration
Review*, the Court of Appeals for the District of Columbia Circuit held that it is improper for an
agency to use "non-responsive" as a redaction tool to withhold information within a responsive
record.[12] Instead of following that binding precedent and releasing the entirety of the three
records, OIP segmented Records 2, 3, and 4 into what it claims are multiple smaller records.[13] It
even went so far as to claim that QFRs posed to the Attorney General and his responses to those
QFRs are separate records, even when all such QFRs and responses are set forth in a single
document.[14] OIP then withheld twenty-one of those "records" in full as non-responsive. OIP
also excised dozens of pages from Record 2, presumably on the theory that those pages are
distinct records from the larger document and do not contain responsive information.

      FOIA provides access to records, not information.[15] FOIA defines a record as, *inter alia*,
"any information that would be an agency record subject to the requirements of this section when
maintained by an agency in any format, including an electronic format[.]"[16] In *Department of
Justice v. Tax Analysts*, the Supreme Court held that "materials . . . qualify as 'agency records'"
when an agency (1) creates or obtains the materials, and (2) the agency is "in control of the
requested materials at the time the FOIA request is made."[17] Although it is possible for material
to be a record but not an agency record subject to FOIA,[18] that distinction is not at issue in this

---

[11] *See* OIP Guidance, *Defining a "Record" Under the FOIA*, updated Feb. 15, 2017, *available at*
http://bit.ly/2jGG6YN.

[12] *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 677 (D.C. Cir. 2016)
[hereinafter *AILA*] ("The [FOIA] statute does not provide for . . . redacting nonexempt information within
responsive records.").

[13] *See, e.g.*, Ex. 3 at 11.

[14] *See, e.g., id.* at 14 (appearing to separate Item 25's question and answer into distinct records).

[15] *See AILA*, 830 F.3d at 677 ("FOIA calls for disclosure of a responsive record, not disclosure of responsive
information within a record.").

[16] 5 U.S.C. § 552(f)(2)(A).

[17] 492 U.S. 136, 144–45 (1989).

[18] *See, e.g., Goland v. Cent. Intelligence Agency*, 607 F.2d 339 (D.C. Cir. 1978) (agency may possess "congressional
records" not subject to FOIA); *Bureau of Nat'l Affairs, Inc. v. Dep't of Justice*, 742 F.2d 1484 (D.C. Cir. 1984)
(agency may possess "personal records" not subject to FOIA).

Ms. Pustay
February 1, 2018
Page 4

case because the records produced by OIP were either created by DOJ staff or obtained by DOJ, and they were in DOJ's control when CoA Institute requested access to them. Therefore, all of the records—whether intact or improperly segmented—are agency records.

In addition, the materials produced by OIP—identified above as Records 2, 3, and 4— each constitute a single record. Each of those items is a cover letter with numerous pages attached to it. When, for example, Assistant Attorney General Weich wrote a cover letter and attached responses to QFRs posed by members of Congress, he created a new agency record within DOJ.[19] Whether the cover letter and attached QFR responses are one single record or two distinct records depends on the manner in which DOJ maintains those records.[20] It appears they are a single record because of the manner in which OIP produced them to CoA Institute. However, even if DOJ considers the cover letter and the attached QFRs and responses distinct records because it maintains them separately in its systems, OIP has conceded that information within the attached QFRs and responses is responsive to the FOIA request. Once it has conceded that much, the agency is required to disclose the entire record—that is, as a unit—and may not use "non-responsive" as a redaction tool.[21]

## Conclusion

To summarize, CoA Institute appeals the improper withholding of information within Records 2, 3, and 4 because they are each one responsive record that OIP (1) improperly segmented into many records, and (2) improperly withheld information by using "non-responsive" as a redaction tool. If you have any questions about this appeal, you may contact me by email at james.valvo@causeofaction.org.

Sincerely,

R. JAMES VALVO, III
COUNSEL & SENIOR POLICY ADVISOR

---

[19] *See, e.g., Parker v. Dep't of Justice Office of Professional Responsibility*, No. 15-1070, 2017 WL 3531507, *2 (D.D.C. Aug. 16, 2017) (finding letter and attachment are one record because the "[l]etter . . . itself touches on the subject matter of the attachment and refers the recipient to examine its contents"); *Cf. Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 411 (2011) (reasoning that when an agency responds to a FOIA request, it creates a "report" with a cover letter and exhibits appended to it—essentially creating a new record as one unit).

[20] *See* 5 U.S.C. § 552(f)(2)(A) (defining a "record" as "information that would be an agency record subject to the requirements of [FOIA] when *maintained by an agency in any format*, including an electronic format[.]").

[21] *AILA*, 830 F.3d at 677 ("FOIA calls for disclosure of a responsive record, not disclosure of responsive information within a record.").

# Exhibit G



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Mr. R. James Valvo, III
Cause of Action Institute
Suite 800
1875 Eye Street NW                           Re:      Appeal No. DOJ-AP-2018-002613
Washington, DC 20006                                   Request No. OLA/14-01096 (F)
james.valvo@causeofaction.org                          ADF:DRC

**VIA: Email**

Dear Mr. Valvo:

You appealed from the action of the Initial Request Staff (IR Staff) of the Office of Information Policy on your Freedom of Information Act request for access to records concerning (1) Executive Order 13457, "Protecting American Taxpayers from Government Spending on Wasteful Earmarks;" (2) communications between political appointees, congressional liaisons and/or the White House regarding requests to commit, obligate, or expend funds; and (3) documents showing the decision of the Department of Justice to commit, obligate, or expend funds based upon a request from the White House, dating since January 21, 2009. I note that your appeal is limited to the IR Staff's withholding of certain non-responsive records.

After carefully considering your appeal, I am affirming the IR Staff's action on your request. The IR Staff determined that each question for the record ("QFR") constituted an individual record because each QFR concerned a different subject. See American Immigration Lawyers Association v. EOIR, 830 F.3d 667 (D.C. Cir. 2016) (recognizing that "agencies . . . in effect define a 'record' when they undertake the process of identifying records that are responsive to the request" and finding that there are a "range of possible ways in which an agency might conceive of a 'record.'"). I have confirmed that the QFR's labeled by the IR Staff as not responsive to your request concerned topics unrelated to your request.

Please be advised that this Office's decision was made only after a full review of this matter. Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your underlying request, and the action of the IR Staff in response to your request.

If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

- 2 -

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  Using OGIS services does not affect your right to pursue litigation.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.  If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office's FOIA Public Liaison for your appeal.  Specifically, you may speak with the undersigned agency official by calling (202) 514-3642.

Sincerely,

3/15/2018

X

Sean R. O'Neill
Chief, Administrative Appeals Staff
Signed by: OIP

# Exhibit H

**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                  *Washington, D.C. 20530*

January 4, 2011

The Honorable John Conyers, Jr.
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Conyers:

Enclosed please find responses to questions for the record arising from the appearance of Attorney General Eric Holder before the Committee on May 13, 2010, at an oversight hearing. We hope that this information is of assistance to the Committee.

Please do not hesitate to call upon us if we may be of additional assistance. The Office of Management and Budget has advised us that there is no objection to submission of this letter from the perspective of the Administration's program.

Sincerely,

Ronald Weich
Assistant Attorney General

Enclosure

cc:    The Honorable Lamar Smith
       Ranking Member

# Questions for the Record
## Attorney General Eric H. Holder, Jr.
## U.S. House Committee on the Judiciary
## May 13, 2010

### QUESTIONS POSED BY CHAIRMAN CONYERS, JR.

1.    In March, 2009, the Inspector General issued a report of an audit concerning the Convicted Offender Backlog Reduction Program covering the years FY 2005 to FY 2007.  The IG found that while the program had resulted in increased analysis of DNA samples, several financial awards went to state laboratories for which no activity pursuant to the Backlog Reduction Program had occurred and additional funding was granted to laboratories that had not used all of the previous' year's award.

    a.    What steps is the Department taking to ensure that Backlog Reduction Program financing is properly used?

**Response:**

    This issue was resolved to the satisfaction of the Office of Inspector General (OIG) on July 31, 2009.  The funds provided by this program have been properly used by states to reduce backlogs of convicted offender samples; the issue raised by the OIG was related to the timely use of the funds.

    The National Institute for Justice (NIJ) has worked closely with the award recipients to help ensure funds are obligated in a timely manner. In late 2007, the Department of Justice's Office of Justice Programs (OJP) began utilizing a new software tool that provides program managers a single report detailing the programmatic and financial activity of each award. Using this new software tool, program managers provide feedback to grantees on the management of their funds. NIJ also provides annual mandatory training for each award recipient on how to best manage their award. Additionally, beginning in FY 2008, NIJ has included a statement in the Convicted Offender and Arrestee DNA Backlog Reduction Program solicitation that indicates applications may be rejected from applicants with prior awards under this program that remain entirely unobligated as of the posting date of the solicitation.

    Please see the attached report, entitled *Department of Justice's Grantmaking Components Response to Improving Grant Management and Oversight: Addressing Key Issues Identified by the Office of the Inspector General* for an expanded discussion of the OIG recommendations and the corrective actions undertaken by OJP, and NIJ specifically.

    b. **During the hearing, Mr. Schiff discussed a pilot program in Los Angeles that would allow for private companies to analyze DNA samples among those in the backlog, and provide for them to be uploaded into CODIS after a technical review by a public lab.  Does the Department have plans to implement a pilot program like the one Mr. Schiff described, either in Los Angeles or elsewhere, to improve the DNA backlog reduction efforts?**

**Response:**

Existing standards allow DNA records generated by private laboratories to be entered into the Combined DNA Index System (CODIS) following technical review by a public forensic laboratory.  The Federal Bureau of Investigation (FBI) Laboratory is currently re-evaluating the policies, standards, and protocols that guide the operation of the National DNA Index System (NDIS) in an effort to increase efficiency and improve the process for entering DNA records into the system.  The FBI has reached out to the stakeholder groups most likely to be affected by any change in NDIS processes and practices to gather information and obtain a better understanding of their concerns and needs.  The Bureau will maintain contact with these groups and continue to seek their input on the acceptability and feasibility of any proposed changes to NDIS operation.  The FBI Laboratory also plans to collect information and suggestions from jurisdictions that have been successful in reducing their DNA backlogs.  Once the relevant information has been obtained, the FBI will evaluate it and determine if a pilot project is appropriate.

2. **According to the IG's 2009 management assessment, DOJ's lack of a uniform financial management system, which has been the case for many years, presents a continuing challenge to meeting the demand for improved financial transparency and accountability.**

    a. **When will DOJ's Unified Financial Management System (UFMS) be implemented fully throughout the Department?**

**Response:**

Implementation of the Unified Financial Management System (UFMS) is underway.  The Drug Enforcement Administration (DEA) was the first Department of Justice (DOJ) component to fully implement UFMS as the system of record. It did so in January 2009.  The Bureau of Alcohol, Tobacco, and Firearms (ATF) adopted the system on November 5, 2010; implementation of UFMS for the U.S. Marshals Service began in March 2010 and is targeted for completion in the second quarter of FY 2012.  Funding for FBI's UFMS implementation has been identified.  Assuming that funding continues to be available, full implementation of UFMS throughout the Department in the remaining DOJ components is scheduled to occur by FY 2013.

    b. **What, if any, additional resources are required to complete the UFMS implementation?**

**Response:**

The FY 2011 President's budget includes $42 million for the continuation of UFMS implementation. For FY 2012 and FY 2013, the Department anticipates spending $125 million to complete the UFMS implementation.

3.   **A September 2009 OIG report raised concerns about the fairness and openness of grants made by the National Institute of Justice (NIJ) during fiscal years 2005 through 2007, including the possibility of conflicts of interest involving NIJ employees reviewing certain grant applications. The Inspector General has identified grant management as a high-priority challenge for the Department each year since 2000 and in early 2009, issued a list of 43 specific recommendations for improving the grant management process across the Department.**

    a.   **What steps is the Department taking to implement the Inspector General's recommendations for improving grant management?**

**Response:**

Please see the attached report, entitled *Department of Justice's Grantmaking Components Response to Improving Grant Management and Oversight: Addressing Key Issues Identified by the Office of the Inspector General,* which lists the 43 specific OIG recommendations, referenced in the November 13, 2009, OIG Report on Top Management and Performance Challenges of the Department of Justice (DOJ), and how each of DOJ's grant-making components is responding or has responded to the recommendations.

    b.   **What changes have been made in the NIJ grant management system to avoid the possibility of conflicts of interest for grant reviewers in the future?**

**Response:**

NIJ has taken many steps to address this issue. In November 2009, NIJ staff attended mandatory ethics training conducted by OJP's Office of the General Counsel (OGC). The training was tailored specifically to address NIJ issues identified in the OIG report. Similar training will be required for all NIJ staff annually. NIJ also recently implemented the following changes to avoid possible conflicts of interest:

- Published and distributed the *National Institute of Justice Guidelines on the Administration and Management of NIJ Grant Programs* (the "Guidelines") to NIJ staff, which documented new and additional policies and procedures for the administration and management of all NIJ grant programs. Sections II and III and Appendices 1 and 2 in the Guidelines, which are attached, specifically address the

3

issue of conflicts of interest. The Guidelines, which were effective as of February 2010, will be updated annually.

- Conducted several mandatory training sessions for all NIJ staff to convey the new guidance and discuss the impact that the Guidelines would have, beginning with the FY 2010 grant award season.

- In collaboration with OGC, developed guidance for submitting and evaluating NIJ's internal conflict of interest forms and a Conflict of Interest Memorandum to be completed by all staff members involved in the pre-award evaluation process.

In addition, NIJ has worked with OGC and OJP's Office of Audit Assessment and Management on the guidance for the peer review process involving conflicts of interest. As each peer reviewer is confirmed by the OJP peer review contractor, each peer reviewer will be sent, via email, a conflict of interest form. The signed form must be returned to the peer review contractor within five business days of receipt. If a reviewer fails to return the form, the NIJ program manager will be notified and the reviewer will be removed from the panel. The peer review conflict of interest form will be maintained in the OJP Grants Management System (GMS). If a reviewer reports a potential conflict of interest, the contractor communicates this to the NIJ program manager, the assigned NIJ Office of Operations primary point of contact, and the Contracting Officer's Technical Representative (COTR). The program manager resolves the issue by making a determination (e.g., assigning the reviewer to another application or removing the individual from the review), as appropriate, to retain the integrity of the peer review process.

# Non-Responsive Record

**23.   Please identify the amount of funding requested by the Justice Department for FY 2011 for investigating and prosecuting financial crimes generally and consumer financial crimes, such as identity theft, in particular.**

**Response:**

The FY 2011 President's Budget includes a total of over $684 million – including $97 million in new program resources – for investigations and prosecutions related to economic fraud.  Within this total, $331 million supports corporate fraud efforts and $178 million is attributable to mortgage fraud efforts.  These dollars span multiple Department of Justice components, such as the FBI; the United States Attorney's Offices; and the Criminal, Civil, Antitrust and Tax Divisions.

While the Department does not track identity theft funding specifically, approximately $176 million dedicated to other economic crimes supports the investigation and prosecution of these types of consumer financial crimes.

**24.   Please identify the amount of funding requested by the Justice Department for FY 2011 for the analysis of DNA samples in rape kits.**

**Response:**

The President's Fiscal Year 2011 budget request includes $150 million for "DNA-related and forensic programs and activities (including related research and development, training and education, and technical assistance)[.]"  This program (referred to in the President's budget request as the "DNA Initiative") is a comprehensive strategy to maximize the use of forensic DNA technology in the criminal justice system that includes grants to address the backlog of unanalyzed DNA samples and biological evidence from crime scenes (which may include evidence from rape and sexual assault crime scenes).

Addressing rape kit backlogs continues to be a priority for the Department.  Last month, the Department's Office on Violence Against Women (OVW) and OJP held a roundtable discussion on forensic DNA backlogs and their impact on victims of sexual assault.  At the roundtable, victim advocates, prosecutors, law enforcement officials, crime laboratory analysts, and survivors of sexual assault discussed the current state of backlogs in the country, the obstacles to eliminating backlogs, how and when victims should be notified when a rape kit is sent to the crime laboratory, and promising approaches to reducing backlogs in this country.  The information gleaned from this

multi-disciplinary discussion will help inform OJP and OVW's research agenda, as well as inform plans for further forensic DNA backlog reduction assistance.

25. 

Non-Responsive Record

Non-Responsive Record

30.     **Extensive research has revealed that misguided policies purporting to be "tough on crime" in fact increase incarceration rates, disproportionately impact poor youth and youth of color, exacerbate the problem of gang-related crime, funnel a disproportionate number of youth who have a cognizable mental health and/or substance abuse disorder into the justice system, and often make communities less safe.  Meanwhile, research from top scholars in a variety of fields including criminal justice, economics, education, psychology, and public health reveals that public dollars spent on effective prevention and education programs are far more effective in stemming violence, curtailing crime and delinquency, and discouraging gang affiliation than broadening prosecutorial powers or stiffening criminal penalties for young people accused of crimes. In light of this research,**

a.     **What steps will the Department of Justice take to prioritize juvenile justice and youth violence prevention in this Administration?**

**Response:**

        This Administration and the Department of Justice are committed to juvenile justice and to preventing gang and youth violence.  The subject of children and violence have been both a personal and a professional concern of mine, for decades, going back to my experience as a prosecutor, as a judge, and as the Deputy Attorney General.  While statistics show a general decline in juvenile violent crime in the United States in recent years, too many communities continue to experience persistently high levels of gang and youth violence. Too many youth and their families cannot break free from the conditions that lead to such violence.  This is especially true when it comes to minority youth.

        With gang and youth violence, there are no quick and easy fixes.  Through evidence-based research, we know much about what works in preventing juvenile crime.  Successful initiatives generally involve multi-disciplinary partnerships, balanced approaches and the use of data-driven strategies.  Prevention, intervention and reentry programs should complement the use of targeted enforcement strategies.  While we must continue to strengthen our law enforcement capacities and capabilities, these efforts must work in combination with strong prevention, intervention, family and community engagement, and reentry initiatives.

        In an ongoing effort to address juvenile justice and delinquency prevention issues, the Administration and Department of Justice continue to promote cross-agency collaboration and coordination through a number of interagency efforts, to include:  the Coordinating Council on Juvenile Justice and Delinquency Prevention, working to prevent and respond to juvenile delinquency and youth victimization, specifically exploring issues of race, ethnicity and gender disparities, education and prevention approaches, and tribal and reentry concerns; the National Forum on Youth Violence Prevention where federal agencies and localities come together to share evidence-based, data-driven approaches to prevent youth and gang violence; and the Attorney General's

Defending Childhood initiative designed to address children exposed to violence and mitigate its negative effects.

The Department of Justice, and our federal agency partners, are working together to make sure federal resources--including funding, information-sharing, and training, and technical assistance--are available to help communities tackle these complex issues. This year, for example, the Department's OJP, through its Office of Juvenile Justice and Delinquency Prevention (OJJDP), made almost $9 million available for a Community-Based Violence Prevention Initiative to help communities develop comprehensive strategies for preventing youth violence. OJP's Bureau of Justice Assistance (BJA) has provided anti-gang training to about 4,000 law enforcement and non-law enforcement personnel since 2007. And, last year, through the American Recovery and Reinvestment Act and Fiscal Year (FY) 2009 funding, OJP awarded more than $2.7 billion to support state and local crime-fighting efforts.

This commitment continues in FY 2011. The President's FY 2011 budget request includes an additional $12 million for a Gang and Youth Violence Prevention Initiative that will target at-risk and gang-involved youth. There is also $25 million requested for a Community-Based Violence Prevention Initiative, which would fund comprehensive approaches that investigate the causes of youth violence and implement a community-based strategy to prevent youth violence by addressing both the symptoms and causes of neighborhood violence.

Additionally, this year, the Department will devote $5 million to address the alarming incidence of children's exposure to violence. Last fall, the Justice Department released findings from the *National Survey on Children Exposed to Violence*, the first comprehensive look at children as victims and witnesses of crime, abuse, and violence from infancy to age 17. The survey concluded that more than 60 percent of our children have been exposed to violence, crime, or abuse either directly as victims or indirectly as witnesses in the home, school and   community. Of these children, nearly half had been physically assaulted; 13 percent were bullied; 6 percent suffered sexual abuse; and 10 percent had been maltreated in the past year. Through this national survey, we have also learned that 1 in 10 children witnessed an assault in their family with about 9 percent were exposed to family violence in the past year, this number increased significantly over the child's lifetime.

Research indicates that early exposure to violence significantly impacts a child's behavior, ability to learn and development of coping strategies. It is associated with increased delinquency and later adult criminality, academic failure, depression and other mental health issues, aggression, and substance abuse. Research  also shows that early intervention is effective in countering the effects of violence. In addition to the $5 million available this year, the President's FY 2011 request includes $37 million for the Children Exposed to Violence (CEV) Initiative. These funds will help us provide critical resources, research, and services for communities nationwide.

We must also assist juvenile offenders as they transition back into the community so they do not continue to be part of the system. Through the Second Chance Act, the Department funds a variety of services such as mentoring, literacy classes, job training, education programs, substance abuse, and rehabilitation and mental health programs for both adult and juvenile offenders. In FY 2009, OJP awarded more than $25 million in grant funding to states, local governments, and non-profit organizations under the Second Chance Act Offender Reentry Initiative to support re-entry programs. In FY 2010, OJP was appropriated $100 million for awards to support re-entry programs. Of that $100 million, $10 million has been set aside for research to identify what works and what doesn't in offender reentry. The Administration seeks to continue this support. For FY 2011 the President has requested an additional $100 million for the Second Chance Act Offender Reentry Initiative.

**b.     Will the Department support legislation and policies that invest in effective prevention and education programs designed to stem violence, curtail crime and delinquency, and discouraging gang affiliation, including the Youth PROMISE Act, Reauthorization of the Juvenile Justice and Delinquency Prevention Act and Reauthorization of the Juvenile Accountability Block Grant?**

### Response:

As mentioned in the response to Question 30a, this Administration and the Department of Justice are committed to addressing juvenile justice, as well as gang and youth violence. The Department supports the goals of the Youth PROMISE Act, the reauthorization of the Juvenile Justice and Delinquency Prevention Act, and the reauthorization of the Juvenile Accountability Block Grant, and would be happy to work with the Committee on these important pieces of legislation.

31. 
Non-Responsive Record

## QUESTIONS POSED BY REPRESENTATIVE WEINER

**45.    The administration through the annual budget has stated that your goal is to hire 50,000 new police officers through the COPS program but has failed to provide a timeline for hiring these new officers.  What is the timeline that the administration is using for hiring these officers?**

**Response:**

In Fiscal Year (FY) 2011, the Department of Justice is requesting $600 million to continue the hiring program.  This funding, coupled with the $1 billion in American Recovery and Reinvestment Act of 2009 (ARRA or the "Recovery Act") funding and the $298 million in FY2010, will be used as the next installment of grants to support the Administration's goal of hiring an additional 50,000 community policing officers throughout the country.  The FY 2011 COPS Hiring grants will directly assist state, local and tribal governments in hiring additional law enforcement officers for deployment  to community policing activities, and will enable agencies to increase their community policing capacity to improve public safety.

While this Administration is committed to putting an additional 50,000 police officers on the street, the Department of Justice and the COPS Office want to ensure that the hiring of these officers is done not only efficiently, but more importantly, effectively. Because of the competing priorities for law enforcement funding to state, local and tribal agencies, it is difficult to set a timeline for hiring all of the additional officers. The FY 2009 ARRA funds as well as the FY 2010 funding cover the full salary and benefit costs of entry level positions. While this was an important alteration of the traditional COPS Hiring programs that have had local matches and salary caps, it is not yet established how the program may look in FY 2011 and beyond.

It is also important to keep in mind that the COPS Hiring grants are only one piece that contributes to the overall success of the COPS program.  The FY 2011 request also includes funding for much-needed training and technical assistance, for programs to improve police-community relationships, and for other innovative collaborations between law enforcement and the citizens they serve.  Equipping police and communities with these valuable tools and knowledge resources is as integral to the success of community policing as the hiring of officers, and should be taken into consideration when looking at the overall FY 2011 COPS Office budget request.

**46.    As part of the COPS Hiring Recovery Program, the COPS office capped the maximum number of officers at 50 per jurisdiction.  I believe that this cap discriminated against large cities, such as New York and instead the department should institute a cap based on a percentage of the total sworn police force.  Have you reviewed the impact of this numerical cap on COPS awards to large cities and what has the department done to fix this situation?**

**Response:**

Because of the extremely strong demand for COPS Hiring Recovery Program funds, and the desire to maximize the effect of the Recovery Act while still keeping the awards at a meaningful level, the COPS office instituted two different limitations on the numbers of officers available to applicants:

- all agencies were capped at no more than 5% of their current actual sworn force strength, and
- no agency received funding for more than 50 officers.

The COPS office concluded that these restrictions were a better alternative to simply giving the first-ranked applicants all of the officers they requested, regardless of the size of their requests. Without these caps, a very small number of agencies would have consumed all of the available funding. With them, only a very small number of agencies received less than a 5% boost in their staffing levels. To date, all agencies that were awarded 50 officers have accepted their awards and have begun the recruitment, hiring and training process.

The COPS Office is continually seeking better ways to balance fulfilling the full requests of individual agencies with the need to distribute the funds to a greater number of agencies across the entire country. The 5% and 50 officer caps will remain in place for FY 2010. The COPS Office has not yet made any decision regarding potential caps in FY 2011, if funds become available.

47.   **What percent of the sworn police force did the COPS Hiring Recovery Program provide in the top 10 largest cities? How many officers would have been provided to the top 10 largest cities had there not been a 50 officer cap per jurisdiction?**

**Response:**

In the top 10 largest cities (all applied under the COPS Hiring Recovery Program), COPS funded 5 cities for an average of 1.1% of their sworn force. If the 50 officer cap had not been in place, COPS would have only funded three of the top 10 cities (Chicago would have received 400 officers, Philadelphia 200 and Dallas 150). Additionally, Los Angeles and San Antonio, who were funded under the 50 officer cap, would not have received awards.

48.   **At a recent Crime Subcommittee hearing, members heard testimony on the importance of testing all rape kits. One witness was a rape victim who testified that her rape kit was untested and that a major obstacle to the kit being tested was funding to state labs.**

a.     **What is the current status of the backlog?**

**Response:**

A recent study funded by NIJ, *The 2007 Survey of Law Enforcement Forensic Evidence Processing*, showed that 14 percent of all unsolved homicides and 18 percent of unsolved rapes involved forensic evidence that was not submitted by law enforcement agencies to a crime laboratory for analysis.

Another NIJ-funded study, *2007 DNA Evidence and Offender Analysis Measurement: DNA Backlogs, Capacity and Funding*, showed that 153 crime laboratories reported a beginning backlog for forensic DNA case analysis of more than 54,000 requests and an end-of-year backlog of more than 70,000 requests.

NIJ synthesized findings from these two recent reports, other research, and data from grantees to provide a full picture of backlogs. The NIJ report, *Making Sense of DNA Backlogs: Myths and Realities*, is available at: http://www.ncjrs.gov/pdffiles1/nij/230183.pdf.

Two major points must be kept in mind when examining the state of DNA backlogs. First, there is no industry-wide definition of what a backlogged forensic case is. NIJ defines a backlogged case as one that has not been tested 30 days after submission to the crime laboratory. However, many laboratories refer to any case in which the final report has not been submitted as a backlogged case. Using that definition, the moment a new case was logged into the laboratory it would become a part of the backlog. Second, the DNA backlog is not static, but is constantly changing. According to the research, there has been tremendous growth in forensic DNA testing between 2005 and 2008. The capacity of laboratories to complete cases grew at approximately the same rate as new cases were submitted. However, the number of new cases submitted grew a bit faster. Hence, the backlog continues to grow in proportion to the increase in demand for services.

Because violent crime is generally prosecuted at the state/local level, the FBI does not receive the same number of sexual assault cases that a state/city crime laboratory would be expected to receive. (Generally, sexual assault cases make up 60-70 percent of the DNA casework of a state and/or city laboratory.) Currently, the FBI Laboratory has 200 criminal case submissions related to alleged sexual assaults out of 1945 total active submissions awaiting nuclear DNA testing. The sexual assault case submissions include 5,049 items of evidence out of a total of 17,773 items of evidence either in or awaiting processing for nuclear DNA examinations. Therefore, 10 percent of the FBI Laboratory's pending case submissions and 28 percent of the specimens awaiting analysis are related to sexual assault cases.

In August 2010, the FBI Laboratory received an interim technical assistance report from the Office of the Inspector General of the U.S. Department of Justice regarding the Laboratory's Forensic DNA Case Backlog. This report contained five

recommendations with which the FBI Laboratory concurred. These recommendations advised that the FBI Laboratory define the term "backlog," address the needs of a Laboratory Information Management System, establish formal time tracking procedures for analysts, resolve evidentiary transfers with the District of Columbia Metropolitan Police Department, and examine the effectiveness of outsourcing agreements. In the meantime, the FBI Laboratory has worked to increase staffing resources, which has resulted in a 25% decrease in its nuclear DNA forensic case backlog during the last 9 months of Fiscal Year 2010.

It should be noted that the reason for the increased submission of evidence is good news. Law enforcement officers are more aware of the power of DNA technology than in the past and are making more requests for testing. In addition, forensic DNA testing requests have risen due to the retesting of older "cold cases" with DNA technologies, increased requests for post-conviction cases, and increasing submissions from property crime cases.

The Department has worked diligently with our state and local partners to support increased collection and testing of forensic DNA evidence in rape kits. We are eager to work with Congress to determine the best ways to address issues raised by the forensic DNA backlog.

**b.    Does the administration support increased funding to state and local crime labs for DNA testing?**

**Response:**

As stated in the response to Question 24, the President's Fiscal Year 2011 budget request includes $150 million for "DNA-related and forensic programs and activities (including related research and development, training and education, and technical assistance)[.]" This comprehensive approach, designed to maximize the use of forensic DNA technology in the criminal justice system, has been developed – with the input of state and local forensic practitioners – to target the greatest areas of need in the nation's forensic community, including addressing the forensic community's need for resources to supplement state and local resources for forensic DNA testing activities.

49. **Non-Responsive Record**

**Non-Responsive Record**



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C   20530*

September 14, 2010

The Honorable Patrick Leahy
Chairman
Committee on Judiciary
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

Enclosed please find responses to questions for the record arising from the appearance of Susan Carbon, Director of the Office on Violence Against Women, before the Committee on May 5, 2010, at a hearing entitled "The Increased Importance of the Violence Against Women Act in a Time of Economic Crisis."

We hope this information is helpful to the Committee.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.  The Office of Management and Budget has advised us that from the perspective of the Administration's program, there is no objection to submission of this letter.

Sincerely,

Ronald Weich
Assistant Attorney General

Enclosures

cc:    The Honorable Jeff Session
        Ranking Minority Member

**Questions for Director Carbon on "The Increased Importance of the Violence Against Women Act in a Time of Economic Crisis" from Senator Sessions**

1. At the hearing, you testified that it [sic] you would be open to consolidation of some programs using VAWA funds, in order to address inefficiencies and to increase the impact of the limited funds available. You further testified that you were "looking at" consolidating some of these programs.

   a. Which programs and services have you been considering consolidating?

   b. Are there other programs and services you think are redundant and can be merged with others?

   c. How many resources can be saved through consolidation?

   d. How can services for crime victims be improved through this consolidation?

**Response to No. 1:**

The Office on Violence Against Women (OVW) is analyzing our grant programs to consider whether consolidation would yield efficiencies for our grantees and for OVW as an administering agency. We also are interested in identifying ways to increase our flexibility to address changes and emerging issues in the field of violence against women. In performing this review, we are weighing whether we can obtain increased efficiency and flexibility without sacrificing important statutory goals, such as reaching underserved populations and encouraging jurisdictions to adopt best practices. We also are considering whether grant programs with very different types of eligible entities (e.g., institutions of higher education, legal service providers) are more effectively administered as free-standing programs.

Over the past ten years, OVW has experienced a substantial growth in funding and responsibilities, while staffing has not kept pace. At this juncture, we therefore are focusing on whether grant consolidation or realignment could improve the way the OVW serves its constituents with its current limited resources. We expect, at a minimum, that some consolidation would reduce administrative burdens (e.g., the need to track funding separately, file multiple reports, and submit multiple applications) on entities that receive grants from multiple OVW grant programs. Likewise, a consolidation of grant programs would decrease certain administrative tasks that OVW performs, permitting us to issue fewer solicitations and conduct fewer peer reviews.

2. At the hearing, you testified that you were looking at an increase of "unmet needs."

   a. How are you measuring these "unmet needs"?

1

### b. Would a consolidation of inefficient programs help satisfy some of these unmet needs?

**Response No. 2:**

There is little research available that specifically addresses the need for particular services or programs; most research in the violence against women field focuses on the incidence and prevalence of such violence or on the effectiveness of certain interventions. In my testimony, however, I noted three pieces of evidence that suggest increased unmet need: a one-day national census of domestic violence services that showed 9,280 requests for service went unmet;[1] a 19.4% increase in calls to the National Domestic Violence Hotline; and a dramatic rise in requests for service at a shelter in Dane County, Wisconsin.[2]

In addition to considering such reports from the field, OVW has two other sources of information regarding unmet need. First, we compare the number of applications that our grant programs receive with the number of applications that we are able to fund. Second, we collect and analyze information reported by OVW grantees in their semi-annual and annual progress reports regarding unmet needs. We recognize the limitations of these sources: entities that have the sophistication to seek and, more important, receive federal funding are not necessarily representative of the neediest communities. In particular, those entities that already have OVW funding are, by definition, having many of their funding needs met. Nonetheless, our analysis of this information highlights some important unmet needs.

Two of our most competitive grant programs illustrate that requests for OVW funding far outstrip our resources. Requests for funding from our Transitional Housing Program consistently exceed the funding available each fiscal year:

- In FY 2007, OVW received 215 applications requesting a total of $70,295,396.87; we were able to fund 51 projects totaling $12,926,569.

- In FY 2008, with eligibility limited only to continuation applications, OVW received 112 applications requesting a total of $29,737,665; we were able to fund 58 projects totaling $14,271,762.

- In FY 2009, OVW received 261 applications requesting a total of $62,523,995; we were able to fund 58 projects totaling 15,224,608.

---

[1] The National Network to End Domestic Violence, *Domestic Violence Counts 2009: A 24-Hour Census of Domestic Violence Shelters and Services*, available at http://www.nnedv.org/resources/census/375-census-2009-report.pdf.

[2] Data **regarding the Hotline and the Dane County shelter** provided to OVW by the U.S. Dept. of Health & Human Services, Administration for Children and Families. .

- This past summer, we received an unprecedented 567 applications requesting a total of $285,371,199 from the Recovery Act Transitional Housing Assistance Program; we were able to fund 91 projects totaling $42,651,316.

Our Legal Assistance for Victims Program is another of OVW's most competitive grant programs, funding only a fraction of the applications received:

- In FY 2008, OVW received 242 LAV Program applications, requesting a total of $107,411,096.99; we were able to fund 66 projects totaling $27,717,281.

- In FY 2009, OVW received 256 LAV applications, requesting a total of $118,524,068; even after reducing award amounts, we were able to fund only 69 projects totaling $29,502,980.

Progress report data submitted by OVW grantees that provide direct services to victims/survivors also gives us a picture of unmet needs. The data reveal that the Transitional Housing and Legal Assistance for Victims Programs have the highest percentages of victims seeking services who were not fully served: for the period January to June 2009, Transitional Housing Program grantees reported that they could not fully serve 26.4% of victims requesting grant-funded services; LAV Program grantees reported 18.3%.[3] The remaining OVW grant programs that provide direct victim services had the following percentages of victims requesting grant-funded services who were not fully served: STOP Violence Against Indian Women (16.8%),[4] Tribal Governments (6.0%), Arrest (5.3%), Rural (3.7%), and Campus (1.3%). For calendar year 2007 (the most recent for which clean data is available), our STOP Violence Against Women Formula Program subgrantees reported that they could not fully serve 5.7% of victims seeking services. These numbers demonstrate that even organizations that receive OVW funding cannot fully serve the victims who seek their aid. Moreover, these figures only capture those victims in funded communities who actually request help from our grantees – they do not reflect the thousands of other victims who never even contact these programs for assistance.

As noted in response to question number 1, above, OVW is focusing on whether grant consolidation might improve administrative efficiency and flexibility and our ability to serve our grantee community and victims. It is premature to predict whether program consolidation would enable OVW to address unmet needs. Given the degree to which applications exceed available funding, however, we do not anticipate that administrative efficiencies could bridge the gap between need and available resources.

---

[3] Grantees and subgrantees are asked to report on victims seeking services who (a) received all the services requested that are funded under the particular grant program ("served"); (b) received some, but not all, of the services they requested that are grant-funded ("partially served"); and (c) received none of the services requested that are grant-funded ("not served"). Victims who are not fully served were either partially served or not served.

[4] The STOP VAIW Program was replaced in FY 2007 with the new Tribal Governments Program. Because some older STOP VAIW-funded projects were still operating during this reporting period, OVW continued to collect separate data from these grantees.



3. Non-Responsive Record

Non-Responsive Record

4. **Can you tell us how many beds exist in women's shelters in the United States that are receiving VAWA grants?  Has that number increased or decreased?**

**Response to Number 4:**

Most federal funding for shelter beds is administered by the U.S. Department of Health and Human Services' (HHS) **under the** Family Violence Prevention Services **Act** (FVPSA); therefore the bulk of emergency shelter for domestic violence victims is not funded by VAWA grants.  In FY 2008, HHS FVPSA grantees reported that they provided shelter for 286,570 survivors and their children.  Fifty-two percent of States reported on shelter nights provided. They reported providing 4,812,768 shelter nights.

A handful of OVW discretionary programs do support emergency shelter service; in addition, OVW's STOP Formula Program grantees subgrant STOP monies to shelter providers.  For these programs, OVW collects information on victims/survivors and their children served and the bed nights spent in shelter.  For the January to June 2009 period, Rural Program grantees reported providing emergency shelter to 1,703 victim/survivors and 1,693 family members for a total of 43,980 bed nights.  The STOP Violence Against Indian Women program reported providing shelter to 45 victim/survivors and 52 family members for 290 bed nights.[5]   The Tribal

---

[5] *See* note 4, *supra.*

Governments program reported providing shelter to 469 victim/ survivors and 660 family members for 22,299 bed nights. For calendar year 2007, STOP subgrantees reported providing shelter to 21,547 victim/survivors and 20,043 family members for 798,960 bed nights. OVW does not collect data on the actual number of "beds" that it funds through these programs.

5. Non-Responsive Record



Non-Responsive Record

6. **What studies need [sic] to be done in order to account for the money and resources being allocated on VAWA at a national level?**

**Response to Number 6:**

In response to a Congressional directive in the Violence Against Women Act of 2000, 42 U.S.C. § 3789p, OVW put in place a comprehensive system to account for grantee activities conducted with VAWA resources. Since 2001, OVW has implemented the VAWA Measuring

Effectiveness Initiative, an intensive effort to improve how we measure and monitor the work of OVW grantees. With the help of the Muskie School of Public Policy at the University of Southern Maine, OVW has developed, revised, and refined computerized progress report forms for our grantees to collect and report information that captures the effectiveness of VAWA funding. In most six-month periods, OVW will receive over 1000 computerized progress reports. OVW staff review each report for completeness, accuracy, and to determine whether the grantee is meeting the goals and objectives of the grant project. Progress reports are then forwarded to the Muskie School for further data cleaning and analysis.

These progress report forms provide OVW with extraordinarily comprehensive and consistent data regarding grantee activities, including services provided to victims. The forms collect both grant program specific activity and uniform information on common activities that occur across several programs. For example, for our Legal Assistance to Victims Program, we receive specific information on legal services so that we can assess whether grantees are providing comprehensive legal services for victims. Across numerous programs, we collect information on victims served, demographics, types of victim services, and certain law enforcement, prosecution, and probation activities. With this data, OVW tracks the use of VAWA grants in communities across America, where VAWA-funded services reach hundreds of thousands of victims every year.

PATRICK J. LEAHY, VERMONT, CHAIRMAN

HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
BENJAMIN L. CARDIN, MARYLAND
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
EDWARD E. KAUFMAN, DELAWARE
ARLEN SPECTER, PENNSYLVANIA
AL FRANKEN, MINNESOTA

JEFF SESSIONS, ALABAMA
ORRIN G. HATCH, UTAH
CHARLES E. GRASSLEY, IOWA
JON KYL, ARIZONA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
TOM COBURN, OKLAHOMA

BRUCE A. COHEN, *Chief Counsel and Staff Director*
BRIAN A. BENCZKOWSKI, *Republican Staff Director*

# United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

April 21, 2010

The Honorable Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Holder,

Thank you for your testimony at the Senate Committee on the Judiciary hearing entitled "Oversight of the U.S. Department of Justice" on April 14, 2010. Attached are written questions from Committee members. We look forward to including your answers to these questions, along with your hearing testimony, in the formal Committee record.

Please help us complete a timely and accurate hearing record by sending your written responses no later than **May 6, 2010**, to my office, attention: Julia Gagne, Hearing Clerk, Senate Judiciary Committee, 224 Dirksen Senate Office Building, Washington, D.C., 20510. Please also send an electronic version of your responses to (b)(6)

Where circumstances make it impossible to comply with the two-week period provided for submission of answers, witnesses may explain in writing and request an extension of time to reply. Where witnesses fail to answer on time, the Committee may note that failure in the official Committee Record.

Again, thank you for your participation. If you have any questions, please contact Julia at (b)(6) .

Sincerely,

PATRICK LEAHY
Chairman

**Written Questions of Senator Tom Coburn, M.D.**
*Attorney General Eric Holder*
*Hearing: Oversight of the Department of Justice*
U.S. Senate Committee on the Judiciary
April 21, 2010

Non-Responsive Record

2 Non-Responsive Record

# Non-Responsive Record

3. Please provide the Department of Justice's annual year-end balance for its Working Capital Fund for fiscal years 2006 through 2009.

   a. Also, please provide projected balances within this same account for fiscal years 2010 and 2011.

4. Please provide the Department of Justice's annual year-end total of unobligated balances for fiscal years 2006 through 2009.

   a. Additionally, please provide the projected unobligated balance totals for fiscal years 2010 and 2011.

5. Please provide the annual amount of expired unobligated balances transferred into the Working Capital Fund for fiscal years 2006 through 2009. Please note that this is different from your Working Capital Fund totals.

6. At the June 2009 Justice Department oversight hearing, I asked how the Justice Department was adhering to your confirmation acknowledgement that grant management be treated as a "consistent priority" to prevent problems. In response to my written questions, you stated that "all three grantmaking components have embraced the recommendations in the OIG report. Each of the Department's grant-making components has implemented the OIG's recommendations…" Furthermore, at the November 2009 Justice Department oversight hearing, Senator Grassley asked you about the status of the 43 recommendations the OIG made in its November 2009 report which highlight grant management as, for the 9th straight year, a top 10 management challenge.

   a. Your response to Senator Grassley's question, received the day before your March 2010 hearing, stated, "each of the Department's grant-making components began implementing the OIG's recommendations with their FY 2009 funding and Recovery Act grants." I am concerned with your response because, not only did it not specifically answer Senator Grassley's inquiry as to compliance with each individual recommendation, it is also inconsistent with findings of the OIG noted in a December 2009 review of Recovery Act awards under the Byrne program.

      i. Please list the 43 specific OIG recommendations referenced in the November 13, 2009 OIG Report on Top Management and Performance Challenges of the Department of Justice, and how each of DOJ's grantmaking components is responding or has responded to such recommendations.

      ii. While the December 2009 OIG report on the Byrne grant awards in the Recovery Act noted the grants were awarded in a prompt, fair and reasonable manner, the report notes that many applications were incomplete, resulting in awards to applicants who had not provided the

2

required information.[1]   That report also noted that grantees did not provide evidence that they could "accurately track Recovery Act funds separately from other federal funds."[2]   In additional, the report notes that, although the application requires each grantee to develop performance measures and include that on its application, the Bureau of Justice Assistance (BJA) did not require that from every grantee.[3]   Please list each of these concerns, as well as any others mentioned in the December 2009 report, and provide details regarding how the Department has remedied each.

b.   In reference to COPS grants, the Office of the Inspector General's April 1, 2009 September 30, 2009 Semiannual Report also noted, "we continued to find the use of grant funds that were not supported by documentation or were unallowable based on the terms and conditions of the grant. In addition, we continued to find use of grant funds that were not related to grant expenditures."[4]   Specifically, how has the Justice Department complied with this recommendation?   Please provide examples of specific improvements in grant awards as a result of this recommendation.

7. Following the June 2009 oversight hearing, you stated in response to my written question regarding President Obama's promise to conduct "an immediate and periodic public inventory of administrative offices and functions and require agency leaders to work together to root out redundancy" that "the Department is committed to identifying savings and efficiencies…Senior leadership of the Department is considering proposals for organizational change that will reduce costs and improve operational effectiveness." That hearing took place in June 2009, and your responses came in October 2009.

a.   While I am encouraged to know that senior leadership is considering proposals, I want to know what proposals for organizational change were examined.  Was a particular proposal ultimately adopted?  If so, how have you implemented any proposals for cost-savings and efficiencies in the Department?

b.   Did any such proposals call for an in-depth review of current grant programs and their effectiveness?  Were those results communicated to Congress?  If not, why not?

c.   Did the Department identify any grant programs that were poorly managed or duplicative and thus in need of elimination?  If so, please provide specific examples of such programs.  If not, why were none identified?

8. The President's proposed FY 2011 Budget for the Department of Justice requests $6.8 billion to activate new prisons and increase correctional staff, a 10% increase from FY 2010.  The Budget specifically provides for the activation of 2 new prisons     Berlin,

---

[1] Office of the Inspector General, Review of the Edward Byrne Memorial Justice Assistance Grant Program, Recovery Act Formula Awards Administered by the Department of Justice's Office of Justice Programs, December 2009, at p. 2.
[2] Id. at 5 6.
[3] Id. at 6.
[4] Office of the Inspector General, Semiannual Report to Congress, April 1, 2009   September 30, 2009, at p. 13.

New Hampshire and Thomson, Illinois.  Berlin was listed on the Bureau of Prisons' (BOP) construction priority list in its budget justification and was recently completed for activation; however, the Thomson facility is an existing state facility purchased by the BOP and will be upgraded for federal use.

    a.  Considering that significant funds are set aside in each appropriations cycle for every proposed new facility, and the BOP maintains a detailed construction and modernization/repair schedule, can you explain why both the Berlin facility and the Thomson facility took priority over other facilities listed in the BOP's budget justification?

    b.  Were there any other state facilities considered for acquisition?  Why or why not?  If so, why was Thomson chosen above other facilities available for purchase and upgrade?

    c.  Please provide the details of the cost to acquire the Thomson facility versus the cost of new construction of similar facilities already listed in the BOP's budget justification as at or near completion.

Senate Judiciary Committee Hearing
"Oversight of the U.S. Department of Justice"
Wednesday, April 14, 2010

Questions Submitted by U.S. Senator Russell D. Feingold
to Attorney General Eric H. Holder Jr.

1. You stated during the April 14 hearing that the Department is looking at the allocation formula that is used for the COPS Hiring Program and that you are in the process of adopting a methodology that would take into consideration concerns raised by sheriffs' offices. What is the status of this review, and how quickly do you anticipate being able to modify the grant application process to ensure that counties receive an appropriate portion of COPS Hiring grants?

2. Non-Responsive Record

3. Non-Responsive Record

Non-Responsive Record

5. Non-Responsive Record

6 Non-Responsive Record

# Exhibit I

████████████████████████████████████

# Defining a "Record" Under the FOIA

## Introduction

One of the first questions that an agency must answer as it begins to process a Freedom of Information Act request is: "What exactly is the requester seeking?" The answer to that question will determine the scope of the agency's search for responsive records and that in turn will create the universe of records that needs to be processed for release. In some instances, this is a straightforward process. For example, the requester might seek a specific report. The agency will search for the requested report and when it locates it, the entirety of the report will be the "record" that is processed. Similarly, the requester might seek all documents authored by a particular person during a certain time frame. The agency will search for such documents and when it locates them, they will all constitute the "records" that need to be processed in response to the request.

There are other times, however, where requesters seek information on a particular topic. In the course of conducting their search for records on that topic, agencies may locate documents that discuss a number of different subjects, only some of which relate to the topic of the FOIA request. If only a portion of a document concerned the topic of a request, a common practice has been for an agency to process only the responsive portion and redact the other portions as "non-responsive" or "outside the scope" of the request. Given that the processing of FOIA requests can be very labor-intensive and time-consuming, it is in both the requesters' interests and the agencies' that time and resources not be expended unnecessarily by reviewing material that was not requested. The practice of not routinely processing portions of a document that are not responsive to a request, but just happen to be physically adjacent to responsive portions, promotes efficiency. By focusing their time and efforts on processing only those portions of records that are responsive to the request, the agency can often respond to the request in a timelier manner while potentially assessing fewer fees to the requester. While many district courts had approved the practice of agencies redacting "non-responsive" material from records processed for release under the FOIA, the propriety of doing so was not addressed by the Court of Appeals for the District of Columbia Circuit until July 2016, when it decided *American Immigration Lawyers Association v. EOIR*, 830 F.3d 667 (D.C. Cir. 2016).

## The *American Immigrant Lawyers Association* Decision

In *American Immigration Lawyers Association v. EOIR*, the plaintiff submitted a request to the agency for records regarding complaints made against immigration judges. *AILA*, 830 F.3d at 669. The agency processed thousands of pages of complaint files, but made redactions of information that the agency deemed to be non-responsive to the FOIA request. *Id*. at 672. Responding to a challenge to this practice, the D.C. Circuit ruled that the FOIA "sets forth the broad outlines of a process for agencies to follow when responding to FOIA requests: first, identify responsive records; second, identify those responsive records or portions of responsive records that are statutorily exempt from disclosure; and third, if necessary and feasible, redact exempt information from the responsive records." *Id*. at 677. Significantly, the court ruled that "[t]he statute does not provide for . . . redacting non-exempt information within responsive records." *Id*.

Relying on the Supreme Court's ruling in *Milner v. Department of the Navy* that the FOIA's exemptions are "'exclusive' and must be 'narrowly construed,'" 562 U.S. 562, 565 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973) & *FBI v. Abramson*, 456 U.S. 615, 630 (1982)), the D.C. Circuit ruled that "non-responsive redactions . . . find no home in FOIA's scheme." *AILA*, 830 F.3d at 677. "Rather," the court declared, "once an agency identifies a record it deems responsive to a FOIA request, the statute compels disclosure of the responsive record—i.e., as a unit—except insofar as the agency may redact information falling within a statutory exemption." *Id*.

In arriving at this conclusion the court did not attempt to answer the important antecedent question of what a "record" is under the FOIA. *Id*. at 678. Indeed, it noted that the "practical significance of FOIA's command to disclose a responsive record as a unit (after deletion of exempt information) depends on how one conceives of a 'record.'" *Id*. In the case

before it, the parties had not addressed this antecedent question and so the court simply took "as a given" the agency's own understanding of what constitutes a "record." *Id*. The court then held that "once an agency itself identifies a particular document or collection of material –such as a chain of emails—as a responsive 'record,' the only information the agency may redact from that record is that falling within one of the statutory exemptions." *Id*. at 678-79.

The court explained that the FOIA itself contains no definition of the term "record," and that "agencies . . . in effect define a 'record' when they undertake the process of identifying records that are responsive to a request." *Id*. at 678. The court also pointed out that there were a "range of possible ways in which an agency might conceive of a 'record'" and noted that the Department of Justice had issued guidance on the topic of processing documents that concern multiple, unrelated topics that agencies could use "when determining whether it is appropriate to divide such a document into discrete 'records.'" *Id*.

### Key Considerations Identified in the D.C. Circuit's Decision

As a result of the D.C. Circuit's ruling in *AILA*, it will be important for agencies to carefully define what they consider to be the "records" responsive to any given FOIA request. Once they determine that something is a "record" they must process it in its entirety for exemption applicability. Only those portions of the record that are exempt can be redacted. After the court's decision in *AILA* it is not permissible to redact information within a record as "non-responsive."

In light of this, agencies will want to ensure that they are carefully defining what is a "record" responsive to a request so that they are not unnecessarily processing material that is not what the requester sought. While the D.C. Circuit did not itself define the term "record" for purposes of the FOIA, some helpful principles emerge from the court's opinion that can guide agencies in making their determinations. First, the court recognized that there are a range of ways to define what is a "record," and that it is the very process of searching for what has been requested by each requester that forms the basis for the determination. Second, while the court drew attention to a number of different disclosure statutes, the "record" definition from the Privacy Act is particularly relevant, given that the Privacy Act is the sister statute to the FOIA, often working in tandem with it. The Privacy Act defines a "record" as "any item, collection, or grouping of information." 5 U.S.C. § 552a(a)(4). Applying this definition of "record" to the FOIA, a record would be any item, collection, or grouping of information that pertains to the subject of a specific FOIA request. This can be a useful construct for FOIA professionals to apply.

### Guidance on Defining a "Record"

Based upon these important considerations, in the absence of a legal definition of "record" for FOIA purposes, we urge agencies to apply the following principles in determining what constitutes a "record" responsive to a FOIA request.

- *Be Guided by the Privacy Act's Definition of "Record"*

  Agencies can use the definition of record found in the Privacy Act to guide their decisions as to what is a record for purposes of the FOIA. Thus, each "item, collection, or grouping of information" on the topic of the request can be considered a distinct "record." This approach allows for a more fine-tuned, content-based approach to the decision, which applies irrespective of the physical attributes of a document. Thus, a "record" can potentially constitute an entire document, a single page of a multipage document, or an individual paragraph of a document. Moreover, based on the subject of a particular FOIA request, an entire string of emails, a single email within a string of emails, or a paragraph within a single email could potentially constitute a "record" for purposes of the FOIA.

- *Link Records to Subject of Request*

  The nature of a FOIA "record" is defined by both the content of a document *and* the subject of the request. For example, if a document consists of a list of summaries of complaints against immigration judges organized by the name of each judge, and the subject of the FOIA request is "complaints against all immigration judges" then the entire document is the "record" for purposes of that FOIA request because the entire document is a "collection or grouping of information" on the subject of the request. Conversely, if the FOIA request specifically concerns "complaints against Judge Smith," then only the complaint summaries concerning Judge Smith would constitute the "record" for purposes of that FOIA request, as only those portions would be the "collection or grouping of information" on Judge Smith.

These distinctions are most easily made when the document can reasonably be broken into discrete units. In the example above, the document was organized by the name of each judge and so readily lent itself to division according to that criterion. In reviewing multi-subject documents to determine whether they can be viewed as a series of distinct "records," agencies should ensure that the document can readily be divided into distinct "items or groupings" of information on different topics so that it is reasonable to view it as a collection of "records." For example, if there are topical headings setting items apart, or bulleted lists describing discrete topics, those are helpful indicators to use in dividing the document into discrete "records." Once that is done, only the discrete "records" that are subject to the request need to be processed. A paragraph within an email or document could potentially constitute a distinct record, but only if the subject of the request is sufficiently specific to pertain only to that paragraph *and* the subject of the paragraph is sufficiently distinct from the surrounding paragraphs to constitute a distinct record.

By contrast, if a document cannot be viewed as containing discrete "items or groupings" of information on different topics then it must be treated as a single "record" and the entirety must be processed for exemption applicability. Logically, the smaller the document, the more difficult it will be to segregate an item of information as a distinct FOIA "record." Indeed, in the *AILA* case, the D.C. Circuit noted that it found "it difficult to believe that any reasonable understanding of a 'record' would permit withholding an individual sentence within a paragraph within an email on the ground that the sentence alone could be conceived of as a distinct, non-responsive 'record.'" *AILA*, 830 F.3d at 679.

### Practical Considerations

To the extent agencies identify multi-subject documents that they divide into discrete "records" for purposes of responding to a particular FOIA request, they must ensure that they take that into account anytime they refer to the volume of "records" responsive to the request. For example, when providing an estimate of the volume withheld, if an agency has divided one ten-page document into five distinct "records," three of which are responsive to the request, when referring to the number of records processed it should use the number three, not one. If the individual emails within a string of emails have been divided into separate "records," then each individual responsive email should be counted when calculating the number of "records" processed or withheld. When dealing with large volumes of material agencies may find it easier to refer to the volume using other metrics, such as the number of pages, rather than the number of "records."

Similarly, when marking records for disclosure, if an agency has divided a multi-subject document into distinct records, it should mark the distinct records clearly so that the requester can readily see how the agency has defined the records responsive to his or her request. To the extent the document has headings, bullets or other textual content that illustrates that the document contains multiple subjects, agencies should release those headings or indicators to the extent possible so that the requester can readily see why and how the agency divided the document into distinct "records."

In sum, after the decision in *AILA* it is important for agencies to carefully consider what constitutes a "record" responsive to any given FOIA request. When documents contain multiple subjects, agencies can review them to determine whether they can be divided into distinct records, based on both the subject of the request and the content of the document. This guidance sets forth workable principles that agencies can apply in making such determinations.

*Updated February 15, 2017*

---

Was this page helpful?

Yes    No